My name is Bill Dickus. I represent Ralph Breeden, the insured and the impellant. And I believe this case presents a number of issues, perhaps too many, but there are five. Well, this is a simple case of summary judgment when there were disputed issues of fact. Thank you, Your Honor. Is not the case simple? This is not simple? That is, I have never found an Oregon case where fraud was determined against any party on summary judgment, including insurance cases. This is the first that I've experienced. If there are issues of fact, you can't have summary judgment? Is that the law? That is the law. Didn't your client admit misrepresentation? I beg your pardon, Your Honor? Didn't your client admit misrepresentation? Not at all. Well, I thought he said he beefed up the estimates of the furniture because he wanted to, he knew there would be a discount, so he, so you say not at all, there's no misrepresentation? I am saying not at all, and so does he. He was told by his initial agent, the one that sold him the policy, to pad the list. He didn't do that? He didn't do that. He was told to put his fiancee's property on the list after the subsequent adjusters told him not to, he didn't. He, over a period of a number of months, as he grew more and more frustrated, he began to try to conciliate with the insurers and the adjusters. He even reduced his claim by $75,000 to $100,000. And when he complained to the state insurance commissioner, he said, I bumped up the furniture. And that doesn't mean he lied, because even I don't yet know what that means. He did agree that he paid. He gave higher values than could be justified. No. Bump up needs. No, he gave higher values than he paid two or five years before the fire. But he was told to do that by Bob Richards, his initial agent. But wait a minute. Let's take a step at a time. You're saying he made no misrepresentations. Now you seem to be saying if he did make misrepresentations, it was because his agent told him to. Saying I bumped up the furniture from what I paid to what the current catalog value is, is not a misrepresentation. He's doing what he was told to do. He did agree he bumped up the furniture. He also agreed with Mr. Peer Lee's characterization of his first inventory that it's exaggerated. But Peer Lee said it was exaggerated not because he's lying about it. It's exaggerated because it doesn't show historical costs. He said we even dreamed of a few extras to break even for some of the things we wanted to replace. Right. I beefed up the furniture for the fact that it was between two and five years old. It would be a good way to slip his fiancée's son's belongings in there. It would be a good way to slip those losses or lose in. I bumped up the furniture on a few items to help cover the loss. Right. He was told by Greg Richards that because of the way they treat his replacement coverage, he wouldn't get more than 50%. And in order to get that, he needs to use current values, the 4,200 for the comparable sofa, not the 3,200 that he paid. If there's an interpretation question there, whether beefing up means above original costs or means lying about value, that's an issue that hasn't yet been determined. And it's not an issue that can be determined on summary judgment. One question, which is in Excerpt Volume 7, is the question whether he ever gets to know what lies the insurer determined he said. So far, he hasn't seen that report. Now, the insurer calls it an attorney opinion letter or a coverage opinion. And that's one way to characterize it. But the record shows that the attorney is the only one who did the investigation. And he reported to the insurer by letter as to what Mr. Breeden is supposed to have said at his examination under oath. The insurer never had the transcript. The insurer never attended the examination and took two whole days. That summary of what the investigator slash attorney claims to be misrepresentation, we have not yet seen. It's sealed in the record now, and that's a motion that has been referred to this panel. And it's an important question because can insurers ever see in First Party's claims, can insurers ever, I beg your pardon, insurers ever know what the attorney slash investigator who is investigating under the authority of the Special Investigations Unit, what his findings are? We haven't been able to do that in this case. There are lower court federal rules decision cases that say when an attorney is investigating as opposed to giving legal opinions or representing one in court, that is not attorney work. That is the business of insurance adjusting, and it's not privileged. Another question is, and it's a simple question, but it's a high dollar question in today's culture, is the policy says the insured has the option, the option to include property of his guests under his own coverage. It doesn't increase his coverage beyond the $147,000 for contents, but he has the option to include his guests' property. He had a fiancee. She had $15,000 to $25,000 worth of property, some hers, some for her children, one of whom was disabled. It was destroyed in the fire. He wanted to put it on the list. The first agent told him to put it on the list. The adjusters who took over said you can't cover that property. In fact, even putting that property on the list is a lie. And the policy is, says any room or border or tenant isn't covered. Your guests are covered. Is the fiancee a guest? Is a person who is not an owner? Counsel, I have a suggestion. You've certainly identified quite a few issues of fact. Why don't we hear from the insurance company, and then you can reserve all of your time and respond. I appreciate that, Your Honor. Thank you. May it please the Court, Lisa Lerer, appearing on behalf of Allstate. I hope that you can hear me. I have laryngitis. That's as much noise as I have. The issue that the Court is focused on this morning is the question whether there is an issue of fact that needs to be addressed by a jury or fact finder in this case because it did come up for summary judgment. It seems to me, Counsel, you might want to address at least the factual issues with respect to materiality, in other words, dispute with respect to the dollar values, and then also with respect to reliance, whether or not the reliance element was met. As you know, this case went back. This is the second time this has been on appeal. After the first ---- Excuse me, Counsel. Could I ask the Deputy Clerk to set the clock? Thank you. This is the second time this case has been on appeal. The first time, the Court issued an opinion in which the judge reached a conclusion that there was evidence in the record that Allstate had established the elements necessary to void the policy based on these representations. He cited a case, the Callaway case, which is the one not involving a fire insurance policy, and in that case the statute that governs the policy is different in terms of not requiring the insurance company to establish reliance. This Court vacated the summary judgment and sent it back to the District Court to deal with this issue of reliance. When it went back, the District Court had the parties submit additional materials focused in part on what issues were back before the Court, and there was a dispute, of course, about whether the District Court should look just at the question of reliance or whether it should look at other issues. It's always been Allstate's position that the only thing that was remanded was this question of the reliance under the Islamazar case. The Court looked at the materials and heard oral argument and determined based on what was in the record that, first of all, there are material misrepresentations. We cited in our brief the case law that talks about when an insurance company asks for information from the insured about what is the nature of a loss, the representations that an insured makes to the company about what the property that he's claiming was damaged or destroyed in a fire is material because that's the basis on which the insurance company has to make its determination about what, if anything, the insurance company owes. Well, Mr. Dikas, in his oral argument, suggests that there are genuine issues of fact with respect to those alleged misrepresentations. How can Judge Gellert decide on summary judgment when there is another side to that? Well, I think the straightforward answer in what we discussed in our brief is that you don't even have to reach these questions about credibility or whether you believe him or not because of the admissions that he made. There are numerous admissions, and we've set out several in our brief of things that he talked about, exaggerations, lies, bumping things up. The letter that he wrote to the insurance commissioner in which he explained that not only did they misstate what the furniture was, they bumped things up, they patted it. If you go through the items that we've set out in the briefs, it talks about, for example, the list of videotapes, the prerecorded videotapes that they claim $14,000 worth of prerecorded videos in the house. This wasn't just a guess of we think we have about $14,000 of videotapes. This was an alphabetized list of titles of tapes and their values. This isn't something that they were just making a guess about. They were going through and giving an itemized list. As the examinations under oath and the depositions proceeded, the numbers started coming down about how many videotapes were in the house. The same is true. Are you saying that there were material issues of fact and the balance was on your side? Is that what you're saying?  Oh, I think there are some disputed issues of fact, but there are admissions. Those admissions alone about the misrepresentations are sufficient to avoid the policy. Whether there are additional things about which there were misrepresentations that there have been no admissions on, you don't even have to get to those issues because there are more than sufficient admissions about misrepresentations to avoid the policy. You've got the admissions about the number of videos, the number of compact discs, the number of video games. And, again, we're talking not about somebody who just guesses, well, I think I have 800 or 900. We're talking about making a specific list saying I have all of these. And as you come down from this 825 to down to 450 or 500, this isn't just an accident. You have 825 titles listed. This is a misrepresentation saying that you've got something you don't have. You have misrepresentations about the furniture, not only questions about the value, but misdescribing what, in fact, was in the house. Is this a seven-piece sectional or is it a three-piece sectional? Does this love seat recline or not? Does the table have a lift top? All these things affect value, but they're all things that affect what property you have as well as the value. It's not just an issue about value. The same is true about the electronics. How does an insurance company value something that is priceless? A painting by a 16-year-old grandchild or grandmother, that's priceless. What's the value of that to the insurance company when you're paying out? At that point, that's what you use professional appraisers for. It's priceless. Nobody can put a value on it. Well, that's true. And there's no way that an insurance company can give you a check that's going to replace if you've lost those kinds of things. But what's at issue here is whether misrepresentation — If the owner says it's worth a million dollars, you're saying that's a lie. Therefore, we can avoid the policy. No, I'm not saying that. I'm saying that what we have in this situation are not items that they're claiming a higher value of because it's an heirloom or a family treasure or something like that. We're talking about videotapes and items of furniture where we're not just talking about the value and whether somebody talked about replacement value versus actual cash value today or purchase price. Those issues were in there, but we don't even have to get to those points because we have admissions that there were misrepresentations about the quantity of the number of videos they own, the type of furniture they have. When does an admission become material as a matter of law? Suppose he misjudged the — he bumped up everything by 1 percent, 5 percent, 20 percent. When does it become material? It becomes material, according to the case law, and U.S. Supreme Court cases as well, that talk about how you determine materiality in an insurance case. The Claflin case that we cited in the brief talks about misrepresentations in which you attempt to get the insurance company to pay you a greater value based on something that you know or have substantial reason to know is not true. There's a difference between a subjective valuation and somebody saying, I have 825 movies in my house when I only have 500. We're not just talking about assigning a dollar value and whether it's actual cash value, replacement value, purchase price. We're also talking about — I don't think you're responding to my question. Suppose, in fact, he said he had 825, but it turns out he only had 820. Or maybe he had only 795, down to 525. Where does it become material? And then who decides that? Well, it becomes a very difficult question. I mean, I'm not sure I can give you a flat-out answer that's going to give you a bright-line rule that if it's 25 videotapes versus 30 that we're going to draw the line there. Well, the problem is we have to have a bright-line rule if we're trying to look at a summary judgment. At a summary judgment. And this situation we have here is that it's not just any one item. It's the totality of items. It's the videotapes. It's the furniture. It's the number of things that could not be identified. There are numerous things here, and we've outlined in the brief. Just to take — just to stay with the concrete example of the videotapes, is this a situation where they listed video, the videotapes, made a list from memory, and then when confronted admitted that they made up the names or that they weren't sure and they probably didn't now that they think about it more? What was the nature of the evidence there? The testimony that's in the case that submitted the list, which includes the inventory, the initial inventory that they provided is 70 pages long, and included in that is the inventory that lists the videotapes and the compact disks and the games as well as furniture and other items. And then when, during examinations under oath and during depositions, they were asked — both the father and the two teenage children were asked about the number of videos in the house, the number of games, the cameras, some of the other items that were in the house that were listed for which nobody could find any remnants in the rubble of the house. Certainly things are going to burn, and you're not going to find everything, but in areas where they were told they would find things, and they could find, like, paper and cloth. All right. Just get to the — what was their answer? Their answer was that, well, we probably didn't have that many, and the numbers kept coming down. Probably didn't have it. Not that we just put it on because we were inflating it. Maybe then we didn't have it. In other words, if you have your house burned down and you have no photographic record, and you have to make a reconstruction from memory as to what was in, you might overestimate, you might misrecall, you might think you might have, or for whatever reason, especially if all the family members are jumping in and say, well, I think we had this, and maybe you put it all down. That's one thing, okay? That's not intentional misrepresentation. It's trying to do the worst-case scenario in terms of loss, best case in terms of compensation. Is it your position that if the insurance company can come through and on cross-examination say, we didn't find any — we found about 40 videotapes or whatever the number is, Judge O'Scanlon is saying, some degree, more than just a couple, where there's no physical evidence to corroborate that amount, are you saying that that then becomes a material misrepresentation? I think it could, but it depends on the circumstances. And the reason that it's not a problem in summary judgment here is the totality of the record that we're dealing here, dealing with here — Well, I know, but wait a minute, wait a minute. You say we don't have to get to the ones where there are disputed facts. There are some that are admissions. But there are others, and I can go through those as well if you'd like. We've got — No, I know it's in your brief. I'm trying to understand, though, if you're taking the answers and saying on the cold record what these look like are admissions, but a jury hearing it and hearing the evaluation could say, well, it's more like the kind of hypothetical I was giving, that, yes, it was overstated, but it was not a deliberate effort to mislead. It was just giving themselves, in every instance where they could, the benefit of the doubt, because they knew they weren't going to get paid full coverage anyway, or full loss anyway. They could get full loss if they, in fact, replaced things because of the weight. Right, but they knew it would never come up. But there are other things in here besides just working with the lists. You have other evidence discussing the things with the children as well. But, for example, you have in Mr. Green's deposition, when he was asked about, they subsequently submitted a second inventory that had far fewer items on it. And the explanation was that they had been told that they needed to just submit a list that included things that they had been able to identify in the rubble and use garage sale crisis for that, and that that was the source of their second list. When asked further questions about that, Mr. Green testified that some of the things that belonged to his son, that they knew they had found, were not included in his second inventory. And the reason he did that was to punish his son for lying for the things that he put in the first inventory. He said that he was upset with his son lied in the stuff that he put into the inventory. And he said that he punished his son by not putting some of his son's things in the second inventory because he had been humiliated by the lies of the stuff that was in the first inventory. So there's a variety of admissions in this record. We're not just talking about the videotapes. It's the totality of all these things. It's the letter to each. Kennedy. Can I ask you to shift because of the time element? Okay. Let's assume that the personal property coverage is voided under your theory. I'm not saying that that's going to happen, but just assume that. Why does that void the entire policy? Because the statute and the policy both provide that the entire policy is void based on the misrepresentations. Yeah, but this is a statutory proviso, right? Correct. And it's my understanding that it's not clear that that statute would be interpreted that way under Oatman. Isn't Oatman, which is a 1913 case, which is as opposed to Hendrickson, which is a contract and policy interpretation. The statutory case would be Oatman, and Oatman construed that as the coverage as being severable. Oatman is construed as being severable. There's a couple of things to look at with Oatman. First of all, you have a different section of the policy that's at issue in Oatman because it deals with the insurable interest in the property, whether the insured had an insurable interest in the real property and the personal property versus the question of whether you made a misrepresentation in an effort to bump up your insurance claim. But if you also look in the reply brief where Mr. Breen's attorneys included the statute that had been enacted by the time that Oatman was passed, that the original case that dealt with this question was the Fowler case. It's an 1897 case in which the Oregon Supreme Court held that if you engage in a kind of misrepresentation that will void coverage under one part of the policy, it voids the entire policy. You have the legislature that enacted the statute in 1907, which is included, excuse me, in the addendum to the reply brief. And if you look at that, you'll see that the provisions that are issued there come in two separate sections. One of them is the one that has to do with misrepresentations, and it talks about the entire policy shall be void if certain things happen. Then you have a second provision that says the entire policy shall be void unless otherwise provided by agreement. And it goes on to talk about the types of agreement that can be reached if the interest in is other than the unconditional sole interest or if the subject of the insurance be a building not owned by the insured entity, simple. So there's two separate provisions there. The fact that the statute has two separate parts, one dealing with the misrepresentation and one dealing with the property interest, there must be a reason for the two separate provisions as it existed at the time that this statute was written and that this case was decided. So I don't think you can use the Oatman case to control the outcome of this. And I think the fact that the question in Oatman was the nature of the insured's interest in the property. They did, in fact, own all of the personal property that was destroyed in the fire. But at that time, his wife was the titleholder of the realty, and he didn't have any interest in it. And so he couldn't recover under the policy because the policy was only in his name. The record discloses that there may have been some misrepresentations, but that the adjusters were not — were not fooled. And they based their evaluation upon their own assessments and without doing any harm to the defendant. Now, is that true? The record reflects — The adjusters were not fooled by any statements made by the defendant. I don't know that you can say they weren't fooled. The adjusters were put in a situation where advance payments were requested. They were not deceived. Okay. Let's put it this way. But I don't know that you can reach that conclusion because — Is that true that they were not deceived? No, it's not. There's been an issue in the fact as to whether or not they were deceived. No, I don't think so, because what you have is Mr. Breeden comes to them for an advance, and he — the first time he was told, he couldn't get an advance until he submitted a property list because that's what's required under the policy. He submits the property list and says it's a true and accurate list of the property. I know that the defendant's attorney disputes that, but we've cited the places in our — in our brief that talks — if you look at the record, you'll find that. And you need to look at the entire record because some of the quotes in the reply brief cut off before the relevant provisions in the record. But he said it's a true and accurate. And at that point, the first person who got it, who had to rely on his statements that this is the property I own and it's true and accurate, he had nothing to base any challenges on. When Mr. Breeden came back for additional advances later, he was asked again to confirm that this is a true and accurate representation of his property. Now, by that point, the adjusters had some suspicions, but those suspicions alone are not enough to avoid the policy. They had to investigate, which is what they were doing. The fact that they had suspicions is not alone enough to eliminate the other parts of the contract which allow for advance payments, but you also have the advance payment agreement that if it turns out that you have no coverage, whether it's because your conduct voids the policy or some other reason, you have to pay it back. But Allstate is still out those advances. You have other reliance elements here as well, and that is the additional cost of the investigation to try to prove the value of the furniture that he claimed is this high-value furniture, that it was not — you have to go out and hire professional appraisers and adjusters to deal with that kind of thing. That's the kind of thing that the Islamisar case talks about as the kind of reliance that will meet the necessary elements of the statute that added the additional elements that didn't exist in the Callaway case or that issue before. I haven't spent any time talking about the additional issues beyond what was remanded to the district court. I think those issues are covered in our briefs, and again, we don't believe this court should be reaching those issues because the remand was of limited scope. Thank you, Counsel. Thank you. Mr. Dekas, you have a fair amount of time. You don't have to use it all, but you certainly — Thank you, Your Honor. I appreciate that. The — Yes, would you like? The Walker case, the 1925 case, which followed Oatman, was specifically a fraud case. It held that even though the policy provided that the entire policy for an entire inventory of cars would be void in the event of fraud, the Supreme Court held that the jury was properly instructed that a misrepresentation about a single car would void the coverage of that car only. The holding of both those cases is that dwelling coverage is separable from contents coverage. And the distinction between that and Hendrickson is what? Hendrickson — it wasn't an issue in Hendrickson. There's a footnote in Hendrickson to Fowler, but it's a dictum footnote. It just wasn't an argued issue. The only issue in Hendrickson is whether reliance is even a proper element of voiding an insurance policy. And for 21 years in Oregon, Hendrickson prevailed and we had tons of avoidance cases because the insurance company didn't have to prove that they believed the alleged misrepresentation. We don't have a deceived insurance adjuster in this case. We have a mistaken insurance adjuster. The insurance adjuster did not believe that Mr. Breeden owned a three-piece, massive, sectional sofa, which the furniture dealer called a seven-piece because it had built-in tables. They didn't believe it existed. They were suspicious from the beginning that he was falsifying his inventory. But their expert said it must have existed because that's the only explanation for the burn patterns on the wall. What's remarkable is there's not a shred of evidence of it left in the house. It might have been in one of the debris piles outside, but not a shred of evidence. So they were mistakenly believing that they were deceived when they weren't. The next question of whether it was worth $3,200, which is what he paid for it, or $4,200, which is what he would have to pay to replace, isn't fraud. He was told to put the $4,200 on the inventory. Counsel, you heard Ms. Lear's comment. Is there a point at which, at the summary judgment level, we can make a determination of law based on the totality of the circumstances? I found no case that does that, Your Honor. I don't believe, first of all, there's no totality here. Second of all, it's not material. Well, I think you heard her argument. In other words, the overstatement of the number of videos, the overstatement of the value of the sofa and all that sort of thing, you add them all up. You add them all up. They don't equal what he omitted in the utility room. With respect to the videos, the testimony is that they went to a video store and got a catalog, and they went through the catalog, and any time they remembered one they owned, they wrote it down. That's why it's alphabetical. And when they questioned the son, who wrote down the first half of the list, did you put any videos down that weren't true? He said, everyone I put down was accurate. I can't speak for the ones that my father put down when he took over the list. Some of those I didn't remember, but when I talked to him, asked him about the movie, then I remembered it. There's no ignition that that was a padded, overstated list of videos, except he said he thought the kids lied. He never said I lied. He said I thought the kids lied. Our evidence is he was misled by that outside of the EUO, but whether that's credible or not is up to the jury. But the kids lying doesn't void the policy. They're not the insurers. Anything further? How old are the kids in this case? I beg your pardon? How old are the kids that supposedly lied? They were high school students, teenagers, I believe, the daughter. The youngest was 16. The oldest was in his last year of high school. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted for decision.
judges: Ferguson, O'scannlain, Fisher